UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No.: 3:10-CR-161-TAV-DCP |
| TAMRAL GUZMAN, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant's pro se motion for compassionate release [Doc. 371] and the supplement filed on her behalf by Federal Defender Services of East Tennessee [Doc. 389]. The United States has filed a response in opposition [Doc. 393]. Several letters of support have also been filed on defendant's behalf [Docs. 369, 370, 372, 373, 374, 375, 376, 377, 379, 380, 381, 382, 383, 394]. The matter is now ripe for adjudication. For the reasons set forth below, defendant's motion [Doc. 371] will be **DENIED**.

### I. Background

In December 2010, a federal grand jury returned an indictment against defendant [Doc. 3]. Ultimately, defendant was charged in a Third Superseding Indictment with 57 felony counts arising from the operation of an illicit pain management clinic, including conspiracy to distribute controlled substances, including oxycodone, hydrocodone, and others, in violation of 21 U.S.C. § 846, possession with intent to distribute controlled

substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 841(b)(2), money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(ii), and structuring, in violation of 31 U.S.C. §§ 5323(a)(3) and 5324(d)(2) [Doc. 103]. Defendant's case proceeded to a jury trial, which commenced on September 24, 2012 [Doc. 210].

On October 2, 2012, defendant, who was on pretrial release, failed to appear for her ongoing trial [Doc. 216]. A bench warrant was issued for defendant's failure to appear and the trial continued in absentia pursuant to Rule 43(c) of the Federal Rules of Criminal Procedure [Doc. 217]. On October 4, 2012, the jury convicted defendant on all charges [Doc. 220]. On or around October 31, 2012, defendant was arrested in the Southern District of Florida for her failure to appear during trial and defendant was transported back to this District [Doc. 233].

Defendant was indicted for her failure to appear during trial in violation of 18 U.S.C. § 3146(a)(1), and she ultimately pleaded guilty [Case No. 3:12-CR-153, Docs. 1, 27, 30]. Defendant was sentenced to a total of 240 months' imprisonment for the offenses in the instant case, plus an additional 18 months, to be served consecutively, for her failure to appear conviction, for a total of 258 months' imprisonment, to be followed by three years of supervised release [Doc. 259].

Defendant is housed at FCI Tallahassee, which currently has one active case of COVID-19 amongst the inmates, zero active cases amongst the staff, and 90 staff and 709 inmates have been vaccinated against COVID-19. COVID-19 Cases, Federal Bureau

2

of Prisons, https://www.bop.gov/coronavirus/ (last visited Oct. 22, 2021). Defendant is 51 years old and medical records establish that she has been diagnosed with, among other ailments, obesity [Doc. 391-3].[1] While in the custody of the Bureau of Prisons defendant has also undergone multiple surgeries and procedures related to breast cancer, a hysteroscopy to remove an endometrial polyp, and suffered from a vaginal prolapse and related bladder issues which resulted in a hysterectomy [Doc. 389-3, pp. 1–46; Doc. 393-3, pp. 20, 44, 68, 92–96]. Defendant also has a history of cervical cancer in 2014, which required a "leep procedure" [Doc. 392-3, p. 66]. Defendant contracted COVID-19 in February 2021 but has since recovered [*Id*. at 78]. Defendant is scheduled for release on March 20, 2031. Inmate Locator, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Oct. 22, 2021).

## II. Legal Standard

A court generally lacks "the authority to change or modify [a sentence, once imposed,] unless such authority is expressly granted by statute." *United States v. Thompson*, 714 F.3d 946, 948 (6th Cir. 2013) (citing *United States v. Curry*, 606 F.3d 323, 326 (6th Cir. 2010)). The First Step Act of 2018's amendment of § 3582(c)(1)(A) revised one such exception. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018). Prior to the First Step Act, a district court could grant relief under § 3582(c)(1)(A)

---

[1] A March 17, 2021, medical record reported defendant's weight as 205 pounds and her height as 65.5 inches [Doc. 393-3, p. 1], resulting in a BMI of 33.6, which is considered medically obese. Adult BMI Calculator, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Oct. 25, 2021).

3

only on motion of the Director of the Bureau of Prisons. Now a court may modify a defendant's sentence upon a motion by a defendant if the defendant has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or after the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

If the defendant surmounts this preliminary hurdle, the Court may grant a sentence reduction "after considering the factors set forth in section 3553(a) to the extent that they are applicable" if it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*Id.*

If the exhaustion requirement is satisfied, courts must then follow the statute's three-step test:

> At step one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant" a sentence reduction. At step two, a court must "find[ ]" whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement on compassionate release resides in U.S.S.G. § 1B1.13. Thus, if § 1B1.13 is still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13] to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." At step three, "§ 3582(c)[(1)(A)]

4

> instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case."

*United States v. Jones*, 980 F.3d 1098, 1107–08 (6th Cir. 2020) (internal citations omitted). "In cases where incarcerated persons [as opposed to the Bureau of Prisons] file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Id.* at 1111. In considering a compassionate release motion, "district courts may deny compassionate release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others" but must "address all three steps" if granting such a motion. *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021). However, as no policy statement applies to defendant-filed motions for compassionate release, the second requirement plays no role. *Id.*

### III. Analysis

#### A. Section 3582(c)(1)(A)'s Preliminary Threshold to Relief: Exhaustion

The Court first examines whether defendant has satisfied § 3582(c)(1)(A)'s exhaustion requirement, which is a mandatory prerequisite to consideration of a compassionate release request on the merits. *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020). "When 'properly invoked,' mandatory claim-processing rules 'must be enforced.'" *Id.* at 834 (quoting *Hamer v. Neighborhood Hous. Servs. of Chi.*,

138 S. Ct. 13, 17 (2017)).  The only exceptions to such a mandatory claim-processing rule are waiver and forfeiture.  *Id.* (citing *United States v. Cotton*, 535 U.S. 625, 630 (2002)).

The government concedes that the exhaustion requirement has been met in this case [Doc. 393].  Thus, the Court may consider the merits of defendant's request.

### B. § 3553(a) factors

As noted above, the Court need not consider all three statutory prerequisites if anyone would serve as a basis for denial.  *Elias*, 984 F.3d at 519.  In this instance, the § 3553(a) factors weigh against compassionate release, so the Court need not address whether defendant has satisfied the extraordinary and compelling reasons prong of the analysis.  "§ 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case."  *Jones*, 980 F.3d at 1108 (internal citations omitted).  The "overarching" inquiry under § 3553(a) is whether the sentence imposed is "sufficient, but not greater than necessary, to comply with the purposes" outlined in § 3553(a) paragraph (2).  18 U.S.C. § 3553(a); *see also Pepper v. United States*, 526 U.S. 476, 491 (2011).  To this end, § 3553(a) directs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentences available, the applicable guideline range, any pertinent policy statement, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims.  § 3553(a); *see also Pepper*, 526 U.S. at 491.

6

Initially the Court notes that during sentencing it conducted a thorough analysis of the § 3553(a) factors, which the Court adopts and incorporates herein [Doc. 291]. The Court begins with the criminal conduct at issue in this case. The Sixth Circuit, in affirming the Court's judgment of conviction, described the facts of the case as follows:

> From October 2008 until her arrest in December 2010, Guzman owned and operated Maryville Pain Management, LLC ("MPM"), in Maryville, Tennessee. While in business, MPM generated more than $2.1 million in receipts. Guzman, a high-school dropout with a GED, had no formal medical training, no license to practice medicine, and no DEA license to issue prescriptions. Before opening MPM, she served as the manager of several restaurants and spent approximately two years working at pain clinics in Broward County, Florida.
>
> MPM was originally located on East Broadway Street in Maryville. The business grew rapidly, publicized by word-of-mouth and paper flyers. Because Guzman lacked medical training and could not legally prescribe drugs, she recruited and hired a succession of nurse practitioners and doctors by placing advertisements on Craigslist and sending faxes to medical practices. From its start, MPM bore all of the hallmarks of an illegal operation, quickly attracting the attention of surrounding businesses because of the customer traffic it generated and the drug deals that were witnessed in MPM's parking lot.
>
> When MPM eventually moved into a medical office park on Parliament Drive in order to accommodate the increasing number of customers, its clientele began causing problems for the neighboring medical professionals. A pediatric dentist testified that people lingered in vehicles in the shared parking lot and that some of the "folks that were in the cars out there were [not] in a fully conscious state." Another witness testified to seeing—and conducting—drug deals in the MPM parking lot, noting that some people waited in their cars for other customers whose appointments they had sponsored. An oral surgeon in an adjacent office characterized the atmosphere as an unruly "tailgate party," with belligerent and unkempt individuals loitering and demanding to use nearby bathroom facilities when those at MPM were occupied. The surgeon reported seeing vehicles from "pretty much every county in Tennessee . . . [and] from Florida, Georgia, North and South Carolina, from Kentucky." The situation eventually deteriorated to the point that the dentist and oral surgeon deemed it necessary

7

to lock their office doors during business hours; they testified that they also lost patients and patient referrals because of the dubious activities at MPM. Law enforcement received numerous complaints, and one police officer testified that pill use "skyrocketed" in Blount County and the number of thefts increased.

The day-to-day internal operations of MPM likewise indicated that something was amiss. Witnesses testified that MPM's waiting room was very crowded, with some customers even sitting on the floor. MPM originally required cash payments from its customers, but later accepted credit cards. At no point did MPM ever accept or process health insurance. Although Guzman had no medical training or license, she did not hesitate to see customers and issue prescriptions on forms that had been signed in advance by MPM's nurses and doctors. The staff testified that they did not conduct meaningful examinations; rather, the emphasis was on speed—one long-time MPM employee testified that, on average, 150 to 170 customers were seen and received prescriptions at MPM each day. Bank employees testified that Guzman regularly deposited thousands of dollars in cash at a local bank.

After MPM opened, local pharmacists noticed an increase in the number of Schedule II narcotics they were dispensing. Groups of people often entered the pharmacies together, as if a bus just pulled up out front," and they carried prescriptions for the same medication or combinations of medications. Those individuals never presented insurance and always paid cash for the prescriptions. The pharmacists realized that it was not uncommon for MPM customers to pay up to $1,500 cash at once for prescriptions. According to the pharmacists, the MPM customers were generally between the ages of 25 and 40, with no visible indications of pain or other infirmities. Oddly, the MPM customers would request particular forms of drugs, such as tablets imprinted with particular markings, thereby suggesting attempts to obtain medications that would be easier to abuse or redistribute.

In September 2009, Guzman initiated the process of establishing a pharmacy at MPM. Using the DEA license number of a physician who was then employed at MPM, Guzman ordered more than $24,000 worth of controlled substances from Dispensing Solutions, Inc. When MPM's physician and nurse practitioner both resigned in October 2009, Guzman, undeterred, operated MPM without any medical practitioner for approximately two weeks, using pre-signed prescription forms. The nurse practitioner who was hired as a replacement by Guzman immediately became concerned that he

8

had joined an illegitimate pain management clinic, and, at the end of October 2009, he began meeting with the DEA regarding his concerns.

As a result, in December 2010, a federal grand jury returned a sealed indictment against Guzman. One week later, law enforcement agents arrested Guzman and executed a search warrant at MPM, seizing currency, customer files, and other documentary evidence. Ultimately, Guzman was charged in a Third Superseding Indictment with fifty-seven counts: conspiring to distribute and possess with intent to distribute oxycodone, hydrocodone, alprazolam, diazepam, and zolpidem, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C), and (b)(2) (Count One); possession with intent to distribute the above-mentioned drugs in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and (b)(2) (Count Two); six counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(ii) (Counts Three through Eight); and forty-nine counts of structuring financial transactions in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2) (Counts Nine through Fifty-Seven).

Over the course of its operations, MPM's gross receipts exceeded $2,164,611. In reviewing the prescription records in sixty files, Internal Revenue Service Special Agent Meredith Louden determined that 97.5 percent of the prescribed drugs were Schedule II narcotics, predominantly oxycodone, and 1.62 percent were Schedule III medications. In conjunction with Guzman's sentencing, Louden reviewed the accounting system of MPM for the period from August 11, 2009, through December 14, 2010. During this 320-day period, 11,333 customers were seen. Based upon prescription records maintained by the State of Tennessee and using the conservative assumption that every customer received a prescription for Schedule II drugs to be taken four times daily for twenty-eight days, Louden estimated that 634,648 dosage units of Schedule II drugs were prescribed. Louden's estimation comported with the drug quantities that individual customers received, based on the evidence presented at Guzman's trial.

[Doc. 299, pp. 2–6].

The Court finds that defendant's offenses were very serious and contributed to the incalculable damage this District and this country incurred from the opioid crisis. Of particular note, the Court finds that the extraordinary drug amount involved, and the dangerousness of the drugs involved, weighs in favor of a lengthy sentence in this case.

9

Indeed, through defendant's management of the pain clinic, over 150 to 170 individuals received prescriptions for pain medications each day. The Court further finds that defendant's conduct in seeing patients and writing prescriptions on pre-signed prescription pads, even when there was no doctor or nurse practitioner employed by her pain clinic, shows an extraordinary lack of respect for the law and presented a serious danger to the public. In addition, as noted above, defendant absconded during trial, violating her conditions of pretrial release, and she was eventually arrested approximately four weeks later in Florida [Doc. 233]. The Court finds that the magnitude of defendant's offenses emphasizes the need for adequate deterrence, to promote just punishment, and to protect the public from future offenses by the defendant. Furthermore, the Court finds that defendant's decision to abscond during trial calls into question her respect for the law and whether she would abide by her conditions of supervised release in this case if her motion for compassionate release were granted.

The Court has also considered the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed education and training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). Further, the Court has considered the kinds of sentences available, the guideline sentencing range, and the need to avoid unwarranted disparities. *Id*.

As the Court noted above, defendant was sentenced to a total term of imprisonment of 258 months [Doc. 259], and she is due to be released March 20, 2031, approximately 113 months from now. The Sixth Circuit has ruled that courts may consider the amount of time a defendant has served when ruling on a motion for compassionate release. *See United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) ("[T]he need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."). In this instance, including good time credit, defendant has served approximately 55 percent of her sentence, leaving a significant portion of her sentence yet to be served. The Court finds that the length of time left on defendant's sentence is another factor that weighs against compassionate release.

The Court is aware of defendant's medical condition and past medical history, and the risk that the ongoing pandemic poses to defendant and to others. However, that risk is lessened by the fact that the Bureau of Prisons has begun vaccinating inmates against COVID-19, and, as the Court noted above, 709 inmates at the facility where defendant is housed have already been vaccinated. The Court also notes that defendant herself admits in her supplement that she contracted COVID-19 while incarcerated and recovered [Doc. 389, p. 1 n.1] and does not assert that she has suffered any lasting complications from her COVID-19 infection. The Court in no way diminishes the risk COVID-19 continues to present, but the Court must still balance the § 3553(a) factors against all other relevant evidence.

11

Moreover, and importantly, defendant's medical records indicate that on January 14, 2021, prior to her February 5, 2021, COVID-19 diagnosis [Doc. 393-3, p. 27], defendant was provided an opportunity to be vaccinated against COVID-19, but declined vaccination [*Id.* at 100, 139]. The Sixth Circuit recently held that a defendant's "access to the COVID-19 vaccine substantially undermines [her] request for a sentence reduction" and "if an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion" for compassionate release "on the grounds that COVID-19 constitutes an extraordinary and compelling justification." *United States v. Lemons*, ___ F. 4th ___, 2021 WL 4699249, at *3 (6th Cir. 2021). Although the Court declines to specifically address the "extraordinary and compelling justification" prong here, the Court nonetheless notes that defendant's refusal of the COVID-19 vaccine undermines her argument for compassionate release.

The Court also acknowledges defendant's concerns for her family, her desire to be reunited with them, the numerous letters of support defendant has received, and defendant's rehabilitation efforts while in prison. Particularly, the Court notes that defendant has displayed an overwhelming amount of family support through many letters of support for her release, which have indicated that family members are willing to care for defendant or serve as her third-party custodian. While the Court recognizes defendant's wish to be reunited with her family, separation from one's family is an unfortunate result of incarceration. Similarly, while the Court recognizes defendant's efforts to improve

12

herself, the Court does not find her efforts so extraordinary as to outweigh the other sentencing factors. And again, while the Court acknowledges the amount of support defendant has received from friends and family, given the severity of defendant's offenses, that support does not outweigh the other relevant sentencing factors.

The Court is also cognizant of defendant's arguments regarding the alleged failure of the Bureau of Prisons to provide her with adequate medical care. To the extent that defendant argues that the Bureau of Prisons is violating her rights by failing to protect adequate medical treatment, the Court finds that such claims should be addressed through 42 U.S.C. § 1983 or another appropriate civil remedy, not through a motion for compassionate release. *See, United States v. Pooler*, No. 3:18-cr-00137, 2020 WL 7046964 (S.D. Ohio Dec. 1, 2020) (collecting cases) ("[T]o the extent that Pooler is arguing that his Motion should be granted due to the Eighth Amendment's prohibition on the infliction of cruel and unusual punishments . . . a compassionate release motion likewise is not the appropriate mechanism or vehicle to raise such a claim of alleged constitutional violations . . . .").

After considering the above, and all other evidence of record, the Court finds that the § 3553(a) factors weigh against compassionate release. In reaching this decision, the Court has considered the parties' filings, the PSR, the § 3553(a) factors and other relevant law, the multiple letters of support submitted on defendant's behalf, and the record as a whole. While the Court notes defendant's medical conditions, that is only part of the compassionate release calculus. On the record before the Court, the sentencing factors

13

weigh against early release, and defendant's motion for compassionate release will be **DENIED**.

## IV. Conclusion

For the reasons set forth more fully above, defendant's motion for compassionate release [Doc. 371] is **DENIED.**

IT IS SO ORDERED.

s/ Thomas A. Varlan  
UNITED STATES DISTRICT JUDGE